

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NO. 2-07-152-CV

TONI SOLANO                                                          APPELLANT

V.

LANDAMERICA COMMONWEALTH
TITLE OF FORT WORTH, INC.,
F/K/A COMMONWEALTH LAND
TITLE COMPANY OF FORT
WORTH; COMMONWEALTH
LAND TITLE INSURANCE COMPANY;
LANDAMERICA FINANCIAL GROUP,
INC., D/B/A COMMONWEALTH LAND
TITLE COMPANY OF FORT WORTH                                          APPELLEES

------------

FROM THE 348TH DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION

------------

### Introduction

Appellant Toni Solano appeals the trial court's order granting appellees'

no evidence and traditional motions for summary judgment. Appellant

challenges various aspects of the trial court's determinations that she failed to present evidence establishing a genuine issue of material fact on the elements of her fraud and Texas Deceptive Trade Practices-Consumer Protection Act (DTPA) claims and also that appellees were entitled to judgment as a matter of law based on the summary judgment evidence they presented.[1]  *See* Tex. R. Civ. P. 166a(c), (i).  We affirm.

## Background Facts

In February 2001, John Solano entered into a contract to purchase real estate from Alpha Development for the purpose of building a home.  The contract (negotiated at a price just under $50,000) described the property that Mr. Solano was purchasing as "Lot 43, Block 1, the Hills of Gilmore Creek

---

[1] Of the sixteen issues raised in her brief, fifteen are listed as stand-alone statements, without any further explanation of the issues presented, any supporting argument, or any associated reference to relevant legal authorities. Many of these fifteen issues substantially relate to the trial court's decision to grant appellees' summary judgment motions.  Other issues only tangentially relate to the trial court's decision or relate to parties included as defendants at the trial court level that are not parties to this appeal.  Because none of these fifteen issues are adequately briefed, we decline to address them. *See* Tex. R. App. P. 38.1(h); *Gray v. Nash*, 259 S.W.3d 286, 294 (Tex. App.—Fort Worth 2008, pet. denied) (deciding that issues were waived because of inadequate briefing).  Rather, we will confine our analysis to the sole issue which was adequately briefed—the trial court's decision to grant appellees' motion on appellant's fraud and DTPA claims.  Appellant labeled this issue as "Issue 1: The evidence does not support the verdict of the trial court about violations of the DTPA, and the questions about fraud."

Addition, City of Fort Worth, Tarrant County, Texas." The contract indicated that Alpha Development was to furnish to Mr. Solano, at its own expense, a title policy issued by Commonwealth Land and Title (which is the common name for the related title company entities comprising the appellees). The contract stated, however, that the title policy would be "subject to the promulgated exclusions (including existing building and zoning ordinances)," and a list of other exceptions. The contract also explained that Alpha Development would provide Mr. Solano with a survey, and that Mr. Solano would have seven days after receipt of either the title commitment or survey to "object in writing to matters disclosed," or such objections would be waived. Finally, the contract instructed Mr. Solano that it was "intended to be legally binding. READ IT CAREFULLY. If you do not understand the effect of this contract, consult your attorney BEFORE signing."[2]

Pursuant to the contract, appellees generated a preliminary title insurance "order" which described the property by the lot and block numbers contained in the contract. Appellees then issued a title insurance commitment, which was "subject to the following terms of the Policy: Insuring Provisions, Conditions

---

[2] In a subsequent transaction, Mr. Solano obtained $225,000 in financing from Cendant Mortgage Corporation to build his residence on the property he had purchased from Alpha Development.

3

and Stipulations, and Exclusions."[3] The commitment contained a metes and bounds description of the property instead of the lot and block number contained in Mr. Solano's real estate purchase contract with Alpha Development. Through attached schedules, the commitment also incorporated a list of exceptions from coverage, explained that the commitment was "not an opinion or report" of the title, and noted that further exclusions from coverage would exist in the final policy though they were not revealed in the commitment. Finally, the commitment advised Mr. Solano that he could obtain a copy of the actual policy form upon request.

On March 14, 2001, Thomas Vogt, a registered land surveyor, completed a survey of the land subject to the contract. The survey noted that the property was an unrecorded plat and gave only a metes and bounds description of the property, rather than the lot and block description contained in Mr. Solano's contract with Alpha Development.

Appellant alleges that in April 2001, while she was out of state, Mr. Solano was told that the contract on the house needed to be emergently finalized and closed. Vanessa McCaffrey, a closing agent with the Brown Law Firm, acted on behalf of appellees on the date the transaction closed. Appellant

---

[3] The commitment also stated that a title policy would be issued upon compliance with certain delineated conditions and upon payment of a premium.

4

asserts that upon arriving at the closing, Mr. Solano was instructed that he had the authority to sign closing documents on behalf of appellant and was told to sign his and appellant's names to the documents. During closing, Mr. Solano signed (apparently on behalf of both appellant and himself) a U.S. Department of Housing and Urban Development (HUD) settlement statement which designated the property by its erroneous lot and block description. The HUD settlement statement listed Alpha Development as the seller, Cendant Mortgage as the lender, and Commonwealth Land and Title as the settlement agent.

That same day, Mr. Solano represented that prior to closing, he had received Vogt's survey and the title commitment. He also acknowledged that (1) the property "is, or may be, subject to zoning laws, regulations and ordinances, and/or building codes of municipal, county, and other governmental authorities," (2) the policy excluded "from coverage loss caused by the exercise of governmental policy power of the enforcement or violation of any law or government regulation, including building and zoning ordinances," and (3) he had been "advised to seek the advice of competent real estate counsel."[4] Upon closing the transaction, Alpha Development transferred a warranty deed to Mr. Solano and appellant which described the property by metes and bounds. The

---

[4] Nothing in the record indicates that Mr. Solano obtained counsel to complete the real estate transaction.

5

final title policy issued to the Solanos excluded from coverage any "loss caused by the exercise of governmental police power . . . or violation of any law or government regulation," specifically including "land division," and also contained several other exclusions and exceptions.

The Solanos sued appellees as well as Thomas Vogt (the surveyor), Cendant Mortgage Corporation, the Brown Law Firm and Steven S. Brown (the title agent and the preparer of the closing documents), Vanessa McCaffrey (the notary at closing), and Alpha Development.[5]  The petition alleged that, in various ways, these parties (individually and sometimes collectively) committed common law fraud, statutory fraud, negligence, negligent misrepresentation, and violations of the DTPA and that they also breached their fiduciary duties and their respective alleged contracts with the Solanos.  The petition specifically alleged that appellees failed to inform the Solanos that the property was not legally platted or suitable for housing, erroneously represented that the property was correctly platted, and forced Mr. Solano to sign closing documents on behalf of appellant.

---

[5] On November 29, 2005, the Solanos filed their second amended petition against these parties.  The Solanos filed their original petition in March 2003 and an amended petition in April 2005; however, neither pleading is contained in the clerk's record on appeal.

6

The Solanos claimed that because of these acts, they could not obtain proper permits for the property and they therefore could not properly construct or use the property as their residence.[6] They also asserted that the land they had purchased did not contain as many acres as they had been led to believe. In their petition, the Solanos requested damages and also asked the trial court to declare their promissory note and deed of trust invalid. In response to the second amended petition, in March 2006 appellees filed an answer in which they generally denied the Solanos' claims, pleaded several affirmative defenses (including a release of claims through a hold harmless agreement and that the Solanos' losses, if any, were excluded by the terms of the title policy), and specially excepted to portions of the petition.

In April 2006, all parties (including the Solanos through counsel) entered into an agreed scheduling order that set deadlines for amending pleadings, serving expert reports, completing discovery, and serving any motions for

---

[6] Documents submitted by appellant in her summary judgment response demonstrated that in 2002, the Tarrant County Health Department refused to approve the Solanos' application for an on-site sewage disposal system at the Solanos' property because the department was unable to "verify the legal description of the property." In 2004, the department wrote the Solanos a letter stating that there had been no change to the status of the application because the property had not been "properly divided and recorded." Appellant's pleading indicated that the inability to install a septic system was the principal reason that appellant's property was allegedly uninhabitable.

summary judgment. On June 19, 2006, through a rule 11 agreement, counsel for appellant and appellees agreed to extend the deadline for service of motions for summary judgment until July 21, 2006 (fourteen days after the original deadline).

On July 21, 2006, in accordance with the rule 11 agreement, appellees filed (in one document) traditional and no evidence motions for summary judgment on all of the Solanos' claims against them. In support of the traditional motion, appellees attached affidavits and provided supporting documentation related to the Solanos' real estate transaction. In the no evidence motion, appellees listed each cause of action which had been pled by the Solanos, specified the elements required to sustain such claims, and asserted that the Solanos had no evidence to support these elements.

The Solanos filed a pro se response (comprising approximately 600 pages of argument interspersed with various documents related to the Solanos' transaction) which reiterated the assertion that appellees were liable on all elements of the Solanos' claims and asserted that the documents and affidavits attached to appellees' motion were "false," "invalid," and "altered."[7] Many of

---

[7] At some point between the filing of their second amended petition in November 2005 and their summary judgment response in August 2006, the Solanos' counsel withdrew. The motion and order regarding the withdrawal are not part of the record on appeal.

the arguments made and documents provided by the Solanos in their response related to defendants other than appellees (who were the sole movants for summary judgment at that time) or referred to other issues regarding appellees than the ones contained within the Solanos' latest pleading.  Also, most of the documents that the Solanos submitted in their response contained words and other marks placed by appellant in an attempt to accentuate the alleged importance of the documents' provisions.

On August 17, 2006, appellant filed a sworn document labeled as an attachment to her summary judgment response.  In that document, she requested more time to further respond to appellees' motions for summary judgment because she alleged that appellees had failed to respond to written discovery and that the affidavits that appellees had attached to their motion were made in bad faith.  While the court's decision on appellees' motions remained pending, appellant also filed various other motions requesting (among other things) that the trial court order mediation, compel discovery, and grant a continuance to allow her time to find new counsel.[8]

---

[8] Though these motions are described by a letter appellant delivered to the trial court, the majority of the motions are absent from our appellate record.

On August 28, 2006, the trial court granted appellees' motions. In the next few months, appellant filed several documents asking the trial court to reconsider its summary judgment ruling. Among other contentions, appellant alleged in these documents that she should have been given more time to seek counsel, that the trial judge improperly evaluated the summary judgment evidence, and that appellees' motions were filed in bad faith and in violation of her interpretation of the June 19, 2006 rule 11 agreement.

On October 31, 2006, in one filing, appellant submitted a traditional summary judgment motion against all of the defendants in the underlying suit, along with an "answer to all summary motions filed by defendants" and another request that the trial court "reconsider [the] motion granted to [appellees]." The filing comprised more than 1,500 pages of further arguments and documents related to the Solanos' transactions.

In December 2006, after appellant had filed assorted other documents (including "questions for the jury" and a proposed jury charge), appellees filed a motion to sever the claims against them from the claims remaining against the other defendants, thereby making final the summary judgment that the trial court had granted in their favor. After appellant objected and the trial court conducted a hearing, the trial court granted appellees' severance motion.

Among various other motions and documents, appellant then filed a motion for new trial (which was denied following a hearing) and perfected this appeal.[9]

### The Granting of Appellees' Summary Judgment Motions

In her sole preserved issue, appellant contends that the trial court improperly granted appellees' summary judgment motions because the "evidence does not support the verdict of the trial court about violations of the DTPA, and the questions about fraud."

When a party moves for summary judgment under both rules 166a(c) and 166a(i) of the rules of civil procedure, we will first review the trial court's judgment under the no evidence standards of rule 166a(i). *See* Tex. R. Civ. P. 166a(c), (i); *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). If appellant failed to produce more than a scintilla of evidence under those standards, then there is no need to analyze whether appellees' summary judgment proof satisfied the rule 166a(c) burden. *See Ford Motor Co.*, 135 S.W.3d at 600.

After an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that there is no evidence to support an essential element of the

---

[9] The appeal was perfected for appellant, but not for Mr. Solano.

11

nonmovant's claim or defense. Tex. R. Civ. P. 166a(i). The motion must specifically state the elements for which there is no evidence. *Id.*; *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 207 (Tex. 2002). The trial court must grant the motion unless the nonmovant produces summary judgment evidence that raises a genuine issue of material fact on the challenged elements. *See* Tex. R. Civ. P. 166a(i); *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002).

When reviewing a no evidence summary judgment, we examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion. *Sudan v. Sudan,* 199 S.W.3d 291, 292 (Tex. 2006). If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no evidence summary judgment is not proper. *Moore v. K Mart Corp.*, 981 S.W.2d 266, 269 (Tex. App.—San Antonio 1998, pet. denied). Less than a scintilla of evidence exists when the evidence is so weak that it does nothing more than create a mere surmise or suspicion of a fact. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983). More than a scintilla of evidence exists when the evidence would enable reasonable and fair-minded people to reach different conclusions. *Ford Motor Co.*, 135 S.W.3d at 601. In reviewing the trial court's decision, we may only consider the material on file as of the time

12

the summary judgment was granted. *Brookshire v. Longhorn Chevrolet Co.*, 788 S.W.2d 209, 213 (Tex. App.—Fort Worth 1990, no writ).

Pleadings, even if sworn to, do not constitute summary judgment proof. *Laidlaw Waste Sys. (Dallas), Inc. v. City of Wilmer*, 904 S.W.2d 656, 660 (Tex. 1995). However, the parties' pleadings control the evidence and arguments which are properly considered in a summary judgment decision. *See SmithKline Beecham Corp. v. Doe*, 903 S.W.2d 347, 354–55 (Tex. 1995)*; Ely v. Gen. Motors Corp.*, 927 S.W.2d 774, 782 (Tex. App.—Texarkana 1996, writ denied) (explaining that the pleadings "frame the issues involved in ruling upon the summary judgment motion"); *Leinen v. Buffington's Bayou City Serv. Co.*, 824 S.W.2d 682, 685 (Tex. App.—Houston [14th Dist.] 1992, no writ) (upholding the trial court's refusal to consider a plaintiff's claim which was not pled at the time of the summary judgment hearing).

In this case, at the time appellees' filed their motions for summary judgment, appellant's petition contended that appellees were liable under the various legal theories pled only because they (1) failed to inform the Solanos that the property was not legally platted or suitable for housing, (2) generated documents (particularly the HUD settlement statement) that used nonexistent lot and block numbers and therefore erroneously represented that the property was correctly platted, and (3) falsely represented that Mr. Solano had authority

13

to sign closing documents on behalf of appellant and forced him to sign the documents. We will restrict our analysis of the summary judgment evidence presented[10] and of the trial court's decision regarding that evidence to these three particular allegations in relation to appellees' no evidence motion on appellant's DTPA and fraud claims.[11] *See Ely*, 927 S.W.2d at 782; *Leinen,* 824 S.W.2d at 685.

Appellant's second amended petition alleged that appellees violated the DTPA through several specific provisions. Specifically, appellant alleged that appellees violated section 17.46(b)(5), (7), (12), (19), and (23) of the business and commerce code. Tex. Bus. & Com. Code Ann. § 17.46 (b)(5), (7), (12),

---

[10] Though appellees submitted evidence in support of their traditional motion for summary judgment, we will not consider this evidence in reviewing the trial court's ruling on appellees' no evidence motion. *See Binur v. Jacobo*, 135 S.W.3d 646, 651 (Tex. 2004). We will also not consider for evidentiary purposes the lengthy written statements submitted in appellant's response to that motion, because such statements are not sworn to or otherwise qualified as summary judgment evidence. *See* Tex. R. Civ. P. 166a(c), (f) (delineating the available types of summary judgment evidence). Instead, we will only consider the documentary evidence attached to appellant's response. *See Binur*, 135 S.W.3d at 651.

[11] Appellant made claims on appeal and in her response to appellees' summary judgment motions about various matters, including but not limited to alleged improper disbursements, alleged improperly altered documents, and alleged incorrect legal descriptions of the property submitted after closing occurred. These claims are unrelated to the three claims pled against appellees, and we will not consider them in this appeal.

14

(19), (23) (Vernon Supp. 2008).  These provisions respectively create violations

of the DTPA when a defendant commits false, misleading, or deceptive acts or

practices by

> (5) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he does not;
>
> . . .
>
> (7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;
>
> . . .
>
> (12) representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law;
>
> . . .
>
> (19) using or employing a chain referral sales plan in connection with the sale or offer to sell of goods, merchandise, or anything of value, which uses the sales technique, plan, arrangement, or agreement in which the buyer or prospective buyer is offered the opportunity to purchase merchandise or goods and in connection with the purchase receives the seller's promise or representation that the buyer shall have the right to receive compensation or consideration in any form for furnishing to the seller the names of other prospective buyers if receipt of the compensation or consideration is contingent upon the occurrence of an event subsequent to the time the buyer purchases the merchandise or goods;
>
> . . .

15

(23) filing suit founded upon a written contractual obligation of and signed by the defendant to pay money arising out of or based on a consumer transaction for goods, services, loans, or extensions of credit intended primarily for personal, family, household, or agricultural use in any county other than in the county in which the defendant resides at the time of the commencement of the action or in the county in which the defendant in fact signed the contract; provided, however, that a violation of this subsection shall not occur where it is shown by the person filing such suit he neither knew or had reason to know that the county in which such suit was filed was neither the county in which the defendant resides at the commencement of the suit nor the county in which the defendant in fact signed the contract.

*Id.*; *see also id.* § 17.50(a) (also requiring detrimental reliance and causation of economic damages in DTPA claims).

Appellant also claimed that appellees committed common law fraud and statutory fraud under Chapter 27 of the business and commerce code. To sustain a common law fraud claim, a plaintiff must demonstrate that

(1) a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the representation was made with the intention that it be acted upon by the other party; (5) the party acted in reliance upon the representation; and (6) the party suffered injury.

*Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 524 (Tex. 1998). To prove statutory fraud in a real estate transaction, the plaintiff must show that there is a

16

(1)     false representation of a past or existing material fact, when the
        false representation is
        (A)     made to a person for the purpose of inducing that person to
                enter into a contract; and
        (B)     relied on by that person in entering into that contract; or
(2)     false promise to do an act, when the false promise is
        (A)     material;
        (B)     made with the intention of not fulfilling it;
        (C)     made to a person for the purpose of inducing that person to
                enter into a contract; and
        (D)     relied on by that person in entering into that contract.

Tex. Bus. & Com. Code Ann. § 27.01(a) (Vernon 2002).

In their no evidence motion, appellees listed these elements, contended

that there was no evidence to prove any of them, and concluded that they were

therefore entitled to judgment as a matter of law.  Our review of the record

indicates that there was no specific allegation in appellant's pleading nor

summary judgment evidence to substantiate that appellees used a chain referral

sales plan or that they filed any suit based upon a written contractual

obligation.  The trial court therefore properly granted the no evidence motion

on these specific DTPA grounds.  *See id*. § 17.46 (b)(19), (23).

The remaining DTPA grounds and both the common law and statutory

fraud claims, as listed above, each require a misrepresentation which is relied

on to a plaintiff's detriment.  Because of that similarity, we will examine

whether there was more than a scintilla of evidence of appellees' allegedly

improper conduct that could satisfy this standard.

17

**Did appellees have a duty to inform appellant that the property was not legally platted or suitable for housing, and if so, did appellant present more than a scintilla of evidence that they failed to satisfy this duty?**

Fraud is not limited to affirmative representations; rather, it may exist when a defendant has a legal duty to disclose certain facts but deliberately fails to do so. *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001). Whether a duty to disclose certain information exists is a question of law. *Id.* In her pleading, appellant contended that appellees had a legal duty to inform her that the property Mr. Solano had contracted for was not legally platted or suitable for housing.

A title insurance policy is a contract of indemnity, and the only duty imposed by such a policy is the insurer's duty to indemnify the insured against losses caused by defects in title. *Chicago Title Ins. Co. v. McDaniel*, 875 S.W.2d 310, 311 (Tex. 1994). The issuance of a title policy does not create a representation regarding the status of the property's title; rather, it comprises an agreement to indemnify the insured against losses caused by any defects in title. *Id.* (holding that a title policy did not create a DTPA violation when, despite the assurances contained in the policy, a preexisting lien existed on the property); *see Tri-Legends Corp. v. Ticor Title Ins. Co. of Cal.*, 889 S.W.2d 432, 443–44 (Tex. App.—Houston [14th Dist.] 1994, writ denied); *Martinka v. Commonwealth Land Title Ins. Co.*, 836 S.W.2d 773, 777 (Tex.

18

App.—Houston [1st Dist.] 1992, writ denied) (explaining that a "title insurance company is not a title abstractor and owes no duty to examine title").

In *Martinka*, a plaintiff sued the title company that had insured his purchase of a residence for failing to disclose that a lis pendens[12] had been filed. *Martinka*, 836 S.W.2d at 774–75. After the trial court granted the title company's summary judgment motion, Martinka contended on appeal that the title company owed a duty to inform him of the lis pendens before issuing its title policy. *Id*. at 775. The appellate court rejected Martinka's argument, explaining that a title company "owes no duty to point out any outstanding encumbrances." *Id.* at 777. The court reasoned that a title insurance company,

> before issuing a policy of title insurance, must necessarily take steps to inform *itself* of the status of the title to be insured. In the search for the information upon which must depend the decision to either issue or decline to commit itself to issue a policy, the insurance company obviously investigates the title for *its own use and benefit* to determine whether it will undertake the risk. The title information on which the company bases its decision relates to the condition of the title held by the grantor *and is not made for the prospective grantee* or lienholder to whom the policy will finally issue.

---

[12] A lis pendens is a document which prevents a party to litigation from transferring an interest in real property until the litigation is resolved. *See* Tex. Prop. Code Ann. § 12.007 (Vernon 2004)*; World Savings Bank, F.S.B. v. Gantt*, 246 S.W.3d 299, 303 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

19

*Id*. at 777–78 (emphasis added) (quoting *Tamburine v. Ctr. Sav. Ass'n*, 583 S.W.2d 942, 948–49 (Tex. Civ. App.—Tyler 1979, writ ref'd n.r.e.)). Based on this reasoning, and on the fact that the existence of the lis pendens did not affect the title company's obligation to indemnify the plaintiff, the *Martinka* court held that the title company had no duty to disclose the lis pendens. *Id*. at 778–79. In other words, "[a]lthough the insurer must examine the title (or have someone do so on its behalf), this investigation is done for the insurer's own information in order to determine whether or not it will commit itself to issue a policy. The investigation is not done for the benefit of the party insured." *Stewart Title Guar. Co. v. Cheatham*, 764 S.W.2d 315, 320 (Tex. App.—Texarkana 1988, writ denied).

It is undisputed by appellees that during their investigation into the property at issue, they learned that the property was unplatted. However, based on the precedent cited above, we hold that the relevance of this discovery was limited to appellees' decision on whether to insure the property, and that the appellees therefore had no legal duty to disclose the unplatted nature of the property to appellant.

Our holding is further supported by Texas precedent which explains that "the concept of 'title' speaks to ownership of rights in property, not to the condition or value of the property. Thus, a defect in, or encumbrance on, title

20

(such as would trigger coverage under a title insurance policy) must involve a flaw in the ownership rights in the property." *Hanson Bus. Park, L.P. v. First Nat'l Title Ins. Co.*, 209 S.W.3d 867, 870 (Tex. App.—Dallas 2006, pet. denied). Appellant's pleading does not contend that the unplatted nature of the property at issue deprived her of any *ownership right* in the property which was covered by her title policy; rather, it asserts that the property being unplatted (coupled with associated governmental regulations on the property) prevented her from the *use* of the property as a residence.[13] For this reason as well, we conclude that appellees, in their limited role as a title indemnitor, had no duty

---

[13] We note that the record fails to indicate that appellant has made any claim against appellees for a violation of the title policy they issued. This may be because the losses the Solanos allegedly sustained may not have been covered under the policy. Summary judgment evidence submitted by appellant established that at closing, Mr. Solano understood that his title insurance policy excluded "from coverage loss caused by the exercise of governmental policy power or the enforcement or violation of any law or government regulation, including building and zoning ordinances and laws and division . . . and [he realized] these could affect [his] ability to build improvements on the property." He therefore agreed to "hold harmless" appellees if such conditions prohibited him "from using the . . . property in any of the ways" he desired. The actual title policy which appellees issued contained similar excluding language. Appellant's pleading specifically alleged that, resulting from the unplatted nature of the property, the harm the Solanos suffered was that the "construction of the home and the type of permits needed for a home was prohibited by county ordinance and city zoning laws."

21

to disclose the unplatted condition of the property at issue.[14] *See McDaniel*, 875 S.W.2d at 311. Because the only pled theories under the DTPA all required affirmative representations, because fraud by a failure to disclose requires a legal duty to disclose, and because we have concluded that appellees had no such duty, appellees' nondisclosure cannot form the basis of appellant's fraud or DTPA claims. *See Bradford*, 48 S.W.3d at 755*; W.L. Lindemann Operating Co. v. Strange*, 256 S.W.3d 766, 776 (Tex. App.—Fort Worth 2008, pet. filed) (requiring a duty to disclose for fraud by concealment or nondisclosure).

Moreover, even if appellees did have a duty in this respect, the summary judgment evidence submitted by appellant indicates that before closing occurred, Mr. Solano was presented with documents disclosing the unplatted condition of the property. For instance, the survey provided pursuant to Mr. Solano's contract with Alpha Development described the property as an "UNRECORDED PLAT" and proceeded to contain a metes and bounds description of the property. Appellant acknowledges in her pleading and in her

---

[14] Our holding in this regard is limited to the duties created within a title insurance relationship, and we express no opinion here on whether other parties to the Solanos' transaction may have had a duty to disclose the unplatted nature of property being purchased.

summary judgment evidence that Mr. Solano received a copy of the survey prior to closing.

Additionally, the Solanos' real estate contract with Alpha Development indicated that Mr. Solano had seven days after receiving the survey to review it and to object to any matters that it disclosed, and that upon such an objection, Alpha Development would extend closing and cure the objections. Another provision of the contract indicated that closing would occur within seven days after objections "to matters disclosed in the . . . survey have been cured." We find nothing in the record indicating that any objection was made to the survey's unrecorded, metes and bounds description of the property.

For all of these reasons, the alleged failure of appellees to disclose to appellant that the property was not legally platted or suitable for housing cannot form the basis of appellant's fraud or DTPA claims.

**Did appellant present more than a scintilla of evidence that appellees erroneously represented that the property was legally platted and that this representation was relied upon?**

Despite having no duty to disclose title defects, a title company can be liable for affirmative representations that cause damages to the insured. *See McDaniel*, 875 S.W.2d at 311; *First Title Co. of Waco v. Garrett*, 860 S.W.2d 74, 76 (Tex. 1993); *3Z Corp. v. Stewart Title Guar. Co.*, 851 S.W.2d 933, 937 (Tex. App.—Beaumont 1993, writ denied) (stating that the "law is settled that

23

a title company does not owe a duty to the insured to discover and disclose a title defect," but that a "title company has a duty to know if its representations are true"). Appellant's pleading alleged that appellees provided closing documents to Mr. Solano that contained erroneous lot and block descriptions of the property and that these documents misled him as to the property he was purchasing.

In her response to appellees' motion, appellant included a copy of the HUD settlement statement, signed by Mr. Solano, which refers to the property by a lot and block number in the "HILLS OF GILMORE CREEK ADDITION . . . FORT WORTH, TEXAS."[15] Appellees have acknowledged that they provided this document to Mr. Solano at closing, and they have not disputed that the document's recitation of the lot and block number is incorrect.

In their summary judgment motion as to appellant's claims under the DTPA and of common law fraud and statutory fraud, appellees contended that

---

[15] Though appellant attached hundreds of pages of other documents to her summary judgment response, she did not provide an adequate explanation through evidence as to which of these documents Mr. Solano received prior to closing. Because of this, and because the HUD settlement statement is the only document specifically mentioned in appellant's pleading regarding the alleged misrepresentation of the status of the property, we will focus on this document in our evaluation of this issue.

there was no evidence that the Solanos relied on any material representation. As is described above, reliance is required as an element of all of these claims.

From our review of the record, we have located no evidence provided in appellant's summary judgment response establishing that, though the property description in the HUD settlement statement may have been incorrect, Mr. Solano relied on this specific description in closing the transaction or that he even noticed that the description was contained in the statement. For instance, appellant provided no affidavit or deposition transcript in which Mr. Solano explained his reliance on the statement (or on any document submitted to him at closing). Nor has appellant explained how any other documents in the summary judgment record qualify as evidence of reliance.[16]

For this reason, summary judgment was properly granted on appellant's DTPA and fraud claims on the basis of appellees' alleged misrepresentation. *See Wayment v. Tex. Kenworth Co.*, 248 S.W.3d 883, 886 (Tex. App.—Dallas 2008, no pet.) (affirming the granting of summary judgment on a DTPA claim because the plaintiff did not satisfy its burden to present some evidence of

---

[16] Again, we express no opinion on whether any evidence exists that the Solanos may have detrimentally relied on representations made by other parties to their transaction. We merely conclude that no evidence was submitted to the trial court that demonstrated reliance on any misrepresentation made by appellees.

reliance); *Head v. Finley*, No. 02-03-00296-CV, 2004 WL 1699895, at *5–6 (Tex. App.—Fort Worth July 29, 2004, pet. denied) (mem. op.) (upholding the granting of summary judgment in a case concerning a real estate transaction on the plaintiff's DTPA, fraud, and statutory fraud claims because the plaintiff failed to produce any evidence of reliance).

Appellant's pleading also contained a DTPA claim against appellees based on their alleged unconscionable actions. *See* Tex. Bus. & Com. Code Ann. § 17.50(a)(3). Appellees challenged this claim specifically in their no evidence motion.

An unconscionable action under the DTPA requires an "act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." *Id*. § 17.45(5) (Vernon Supp. 2008); *see Bradford*, 48 S.W.3d at 760 (adding that an unconscionable act under the DTPA is one that is "glaringly noticeable, flagrant, complete and unmitigated"). Having determined that appellees had no duty to disclose the unplatted nature of the property, that Mr. Solano was nonetheless provided with a document indicating that the property was unplatted, and that no evidence of reliance was presented by appellant on any misrepresentations, we also conclude that there was no evidence presented

which would satisfy the unconscionable standard and that the trial court properly granted summary judgment on this basis.

**Did appellant present more than a scintilla of evidence that appellees forced Mr. Solano to forge appellant's signature on documents at closing?**

Finally, the Solanos' pleading contended that appellees defrauded them by requiring Mr. Solano to forge appellant's signature on several closing documents and by issuing the title insurance policy based on those forgeries.[17]

If a person signs another's name to a document with authority to do so, there is no forgery. *See In re Estate of Flores*, 76 S.W.3d 624, 630 (Tex. App.—Corpus Christi 2002, no pet.) (explaining that "forgery is defined as altering, making, completing, executing, or authenticating a writing so that it purports to be the act of another who did not authorize that act"); *First Coppell Bank v. Smith*, 742 S.W.2d 454, 460 (Tex. App.—Dallas 1987, no writ), *overruled on other grounds*, *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 678 (Tex. 2000) (concluding that forgery was established because the witness testified "unequivocally that she did not authorize anyone to sign her name to the deed of trust"); *see also* Tex. Penal Code Ann. § 32.21(a)(1)(A)(i) (Vernon

---

[17] Although no evidence was submitted in appellant's summary judgment response directly establishing that she was not at closing, attorneys for two defendants acknowledged during a hearing that she was not present. For the purposes of this appeal, we will therefore assume that Mr. Solano signed appellant's name to closing documents, as she alleges.

27

Supp. 2008). An individual has the authority to sign a spouse's name to a document when acting as an agent for that spouse. *See* Tex. Fam. Code Ann. § 3.201(a)(1) (Vernon 2006); *Nelson v. Citizens Bank and Trust Co. of Baytown, Tex.*, 881 S.W.2d 128, 131 (Tex. App.—Houston [1st Dist.] 1994, no writ) (noting however that a "spouse does not act as an agent for the other spouse solely because of the marriage relationship").

In their motion, appellees contended that there was no evidence that appellant's signature was forged at their insistence or that any act undertaken for appellant was done without her knowledge and consent. Our review of the record indicates that appellant submitted no affidavit or other summary judgment evidence in response to appellees' motion which indicated that her husband did not have the authority to sign closing documents on her behalf. While some of appellant's unsworn arguments in her response at the trial level and some of appellant's statements during her argument at the hearing on appellees' motion contend that no such authority was given, these statements cannot be considered as summary judgment evidence in opposition to appellees' no evidence motion.[18] *See Medford v. Medford*, 68 S.W.3d 242, 247 (Tex.

---

[18] Documents submitted by appellant in her summary judgment response indicate instead that near the time that closing occurred, the Solanos collectively intended to finalize the transaction. For instance, in late March 2001, just a few weeks before closing occurred, Mr. Solano signed a power of

App.—Fort Worth 2002, no pet. ) (stating that "[u]nauthenticated or unsworn documents, or documents not supported by any affidavit, are not entitled to consideration as summary judgment evidence"); *Madeksho v. Abraham, Watkins, Nichols & Friend*, 57 S.W.3d 448, 455 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (noting that conclusory arguments contained in a response to a summary judgment motion are not evidence); *Quanaim v. Frasco Rest. & Catering*, 17 S.W.3d 30, 42 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (explaining that "neither the motion for summary judgment, nor the response, even if sworn, is ever proper summary judgment proof").

There was also no competent evidence submitted in appellant's response to appellees' motion to substantiate the other allegations contained in appellant's pleading related to the alleged forgery: that appellees told Mr. Solano that an emergency closing was required, that Mr. Solano questioned whether he had the authority to sign for appellant, that appellees told Mr. Solano that because Texas is a community property state, he automatically had authority to sign for appellant, or that they insisted that he sign the documents on her behalf. The mere pleading of these allegations was insufficient to defeat

---

attorney authorizing appellant to act in his behalf in executing documents related to the property. Also around that time, the Solanos jointly signed a waiver of the builder's requirement to supply a list of subcontractors and suppliers upon the commencement of construction at the property.

appellees' no evidence motion. *See Laidlaw Waste Sys., Inc.*, 904 S.W.2d at 660. Therefore, the trial court properly granted appellees' no evidence motion for summary judgment on this basis as well.

Because the record establishes that appellees moved for a no evidence summary judgment on the DTPA and fraud theories that had been pleaded against them, and because appellant failed to present more than a scintilla of competent summary judgment evidence to substantiate these claims, the trial court properly granted appellees' motion. Appellant's only preserved issue is overruled.

### Conclusion

Having overruled appellant's only preserved issue, we affirm the trial court's judgment.

PER CURIAM

PANEL:  LIVINGSTON, DAUPHINOT, and MCCOY, JJ.

DELIVERED:  December 4, 2008